**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-2941-24

RICHMOND NATIONAL
INSURANCE COMPANY, a/s/o
INDEPENDENCE SEARCH &
ABSTRACT CO., INC.,

    Plaintiff-Respondent,

v.

LAURA PATTERSON,

    Defendant-Appellant,

and

JAMES PATTERSON,

    Defendant.

_____

Submitted March 4, 2026 – Decided August 6, 2026

Before Judges Gummer and Jacobs.

On appeal from the Superior Court of New Jersey, Law Division, Union County, Docket No. L-0319-24.

Schiller, Pittenger & Galvin, PC, attorneys for appellant (K. Joseph Vyzas, of counsel; Jay B. Bohn, on the briefs).

Cozen O'Connor, PC, attorneys for respondent (Michael D. O'Donnell, on the brief).

PER CURIAM

In this unjust-enrichment case involving an undisclosed mortgage, defendant Laura Patterson appeals from an order denying her summary-judgment motion and granting the cross-motion of plaintiff Richmond National Insurance Company. She also appeals a subsequent order denying her motion for reconsideration. Based on our de novo review of the summary-judgment motion and cross-motion and discerning no abuse of discretion in connection with the reconsideration-motion order, we affirm.

## I.

In 2000, Laura Patterson and her then-husband James Patterson purchased a property in Mountainside.[1] Laura, as the attorney in fact for James, executed an October 25, 2004 note (the Note) on behalf of James, as borrower, to Merrill Lynch Credit Corporation (MLCC) for a $229,000 loan. Pursuant to paragraph

---

[1] We use first names in referring to Laura Patterson and James Patterson for purposes of clarity given that they have the same last name. We mean no disrespect in doing so. We also use "defendant" in referring to Laura because she is the only defendant who filed an answer and participated in this case.

2

one of the Note, entitled "BORROWER'S PROMISE TO PAY," the borrower promised to pay MLCC $229,000 plus interest in return for the loan. Paragraph nine of the Note, which was entitled "OBLIGATIONS OF PERSONS UNDER THIS NOTE," provided:

> If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety or endorser of this Note, is also obligated to keep all the promises made in this Note.

> [(Emphasis added).]

Laura and James signed an October 25, 2004 mortgage (the Mortgage) securing the Note. The Mortgage identified James as the "Borrower." The Mortgage "secure[d] to [MLCC]: (i) the repayment of the Loan, and all renewals, extensions and modifications of the Note; and (ii) the performance of Borrower's covenants and agreements under this [Mortgage] and the Note." The Mortgage defined "Loan" as "the debt evidenced by the Note, plus interest, any prepayment charges and late charges due under the Note, and all sums due under this [Mortgage], plus interest." Paragraph thirteen of the Mortgage, which was

A-2941-24

entitled "Joint and Several Liability; Co-signers; Successors and Assigns Bound," provided:

> Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this [s]ecurity [i]nstrument but does not execute the Note (a "co-signor"): (a) is co-signing this [s]ecurity [i]nstrument only to mortgage, grant and convey the co-signor's interest in the [p]roperty under the terms of this [s]ecurity [i]nstrument; (b) is not personally obligated to pay the sums secured by this [s]ecurity [i]nstrument[.]

James executed the Mortgage on a signature line that identified him as "Borrower." "Laura Patterson, Individually" was written by hand below the signature line Laura executed.

The Mortgage was not recorded at the time it was executed. According to Laura, MLCC discovered the Mortgage had not been recorded and required it be re-executed and recorded. On June 20, 2012, Laura and James re-executed an October 25, 2004 "FIXED/ADJUSTABLE RATE RIDER" to the Mortgage. A copy of the Mortgage with the June 20, 2012 re-executed rider was recorded in the Union County Clerk's Office on July 13, 2012.

The rider provided the following:

> T[his rider] . . . is incorporated into and shall be deemed to amend and supplement the Mortgage, [d]eed of [t]rust, or [s]ecurity [d]eed (the "[s]ecurity instrument")

4

of the same date given by the undersigned ("Borrower") to secure Borrower's . . . Note . . . to M[LCC] ("Lender") of the same date and covering the property described in the [s]ecurity [i]nstrument[.]

Laura and James executed the rider on signature lines identifying each of them as "Borrower."

Laura and James divorced in 2014. In an August 1, 2014 property settlement agreement (PSA), they agreed to "share all equity in the [Mountainside] house equally, with each receiving 50% of same. [James] shall have until May 30, 2016[,] to decide whether the house will be listed for sale or whether he will buy-out [Laura]'s interest in same." They also agreed:

> [James] shall move out of the marital premises within (45) forty-five days of this [PSA] being executed by both parties. The parties agree that until such time as [James] either buys out [Laura]'s interest in the premises or until such time the premises is sold, whichever occurs first, Laura and the parties' children shall have the sole and exclusive use, occupancy and possession of same and shall be permitted to reside there until closing of either the buy-out or the sale. <u>The parties acknowledge that upon [James]'s vacating the [marital] residence, [Laura] shall be responsible for 100% of the mortgage</u>, homeowner's insurance, real estate taxes, and maintenance . . . . [Laura] shall make all payments for the carrying costs on the house promptly and will indemnify and hold [James] harmless with respect to same.
>
> [(Emphasis added).]

5

Laura and a court-appointed attorney-in-fact for James entered into a January 3, 2021 contract to sell the property. Independence Search & Abstract Co., Inc. (Independence) was retained to perform a record search of the property. Independence performed that search but failed to identify a mortgage on the property.

Laura, as a grantor, executed a February 27, 2021 deed conveying the property to the buyers. The deed stated:

> <u>Promises by Grantor</u>. The Grantor promises that the Grantor has done no act to encumber the property. This promise is called a "covenant as to grantor's acts" (N.J.S.A. 46:4-6). This promise means that the Grantor has not allowed anyone else to obtain any legal rights which affect the property (such as by making a mortgage or allowing a judgment to be entered against the Grantor).

Laura, however, knew a mortgage encumbered the property; she had been making the mortgage payments until a few months prior to the closing. According to Laura, she "expected that Mortgage to be paid at the closing." But it wasn't. After the closing, Laura received $267,297.36 as her share of the net proceeds of the sale of the property. When she received a check in that amount, Laura realized the Mortgage had not been paid. According to Laura, she "contacted [her] attorney to inquire about the payment of the Mortgage, and he told [her] 'not to worry about it.'"

Following the sale of the property, a foreclosure action was commenced based on the Note. Plaintiff paid the $195,431.91 balance of the payments due under the Mortgage securing the Note. Plaintiff had insured Independence pursuant to a professional liability insurance policy.

Plaintiff, as Independence's subrogee, filed a complaint against Laura and James in 2024, seeking a $195,431.91 judgment. Plaintiff pleaded causes of action for unjust enrichment, fraud, and negligent misrepresentation. Laura filed an answer and a cross-claim for indemnification against James. Plaintiff subsequently asked the court to enter default against James.

Defendant moved for summary judgment, seeking dismissal of the complaint. Plaintiff opposed the motion and cross-moved for summary judgment on the unjust-enrichment claim. After hearing argument, the court entered a January 17, 2025 order with an accompanying statement of reasons denying Laura's motion and granting plaintiff's cross-motion for summary judgment. Referencing the PSA and the rider, the court found Laura had "adopt[ed the] . . . mortgage obligations" and held she "was unjustly enriched when she received proceeds from the sale of the property without satisfying the attached mortgage." The court later denied defendant's motion for reconsideration in a February 14, 2025 order.

7

A-2941-24

This appeal followed.[2]

## II.

"We review a grant of summary judgment de novo, applying the same standard that governed the trial court's determination." Padilla v. Young Il An, 257 N.J. 540, 547 (2024). Summary judgment is proper if, viewing the evidence in a light most favorable to the non-moving party, the record demonstrates "no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law." Friedman v. Martinez, 242 N.J. 449, 471-72 (2020) (quoting R. 4:46-2(c)). We review a trial court's order on a reconsideration motion under an abuse-of-discretion standard. Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021).

"[C]ontract interpretation is a question of law we review de novo." Del. River Joint Toll Bridge Comm'n v. George Harms Constr. Co., 258 N.J. 286, 303 (2024). In considering de novo the contracts at issue in this case, we apply

---

[2] On April 19, 2025, the court entered an order dismissing the case without prejudice for lack of prosecution. In her notice of appeal, Laura indicated she was appealing the April 1, 2025 dismissal order as well as the January 17, 2025 summary-judgment order and the February 14, 2025 reconsideration-motion order. However, she did not brief on appeal any issues relating to the April 1, 2025 order. Accordingly, we deem waived all issues relating to that order. See Morris v. T.D. Bank, 454 N.J. Super. 203, 206 n.2 (App. Div. 2018) (finding "[a]n issue not briefed is deemed waived on appeal").

A-2941-24

our guiding principles of contract interpretation. When determining the meaning of a contract, "[t]he plain language of the contract is the cornerstone of [a court's] interpretive inquiry." Extech Bldg. Materials, Inc. v. E&N Constr. Inc., 262 N.J. 271, 280 (2025) (alteration in original) (quoting Barila v. Bd. of Educ. of Cliffside Park, 241 N.J. 595, 616 (2020)). "[U]nambiguous contracts will be enforced as written unless they are illegal or otherwise violate public policy." Ibid. (quoting Manahawkin Convalescent v. O'Neill, 217 N.J. 99, 118 (2014)). The "court's task [i]s 'not to rewrite a contract for the parties better than or different from the one they wrote for themselves.'" Globe Motor Co. v. Igdalev, 225 N.J. 469, 483 (2016) (quoting Kieffer v. Best Buy, 205 N.J. 213, 223 (2011)).

Applying those principles, we agree with the trial court's conclusion that Laura "adopt[ed the] . . . mortgage obligations." The June 20, 2012 rider provided that it was "amend[ing] and supplement[ing] the Mortgage." Laura executed the rider on a signature line identifying her as "Borrower." In the PSA, Laura agreed she would "be responsible for 100% of the mortgage" once James vacated the property. The Mortgage "secure[d] to" MLCC "the repayment of the" $229,000 loan and "the performance of Borrower's covenants and agreements under the [Mortgage] and the Note." The Note provided that anyone

who takes over the obligations of the Note would be "obligated to keep all the promises made in this Note," which included the promise to repay the $229,000 loan plus interest. Thus, under the clear language of the relevant contracts, Laura had taken responsibility for making the payments under the Mortgage that secured the Note. And she was aware of that obligation. She had made the mortgage payments until a few months prior to the closing and "expected that Mortgage to be paid at the closing."

To establish unjust enrichment, a party must show the other party "received a benefit and that retention of that benefit without payment would be unjust." VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554 (1994); see also Woodlands Cmty. Ass'n v. Mitchell, 450 N.J. Super. 310, 317 (App. Div. 2017) ("[t]o establish unjust enrichment, [a party] must show that it expected remuneration from [the other party] at the time it performed or conferred a benefit on [the other party] and that the retention of that benefit without payment would be unjust"); Pagnani-Braga-Kimmel Urologic Assoc., P.A. v. Chappell, 407 N.J. Super. 21, 26 (Law. Div. 2008) ("Unjust enrichment arises where one party fulfills the duty of another and the benefited party does not compensate the burdened party."). When plaintiff paid off the mortgage, it had reason to expect remuneration from the person actually responsible for the mortgage

payments. That person was Laura, who had benefited from plaintiff's payoff of her mortgage obligation. That plaintiff's payment of Laura's mortgage obligation also benefited Independence or the buyers facing foreclosure does not render invalid plaintiff's unjust-enrichment claim. See Cohen v. Home Ins. Co., 230 N.J. Super. 72, 83 (App. Div. 1989) (finding viable the plaintiff's restitution claim when he had "made a prima facie showing that the benefit he conferred on defendant was necessitated for the protection of third persons").

Holding Laura responsible for payment of the obligation she had undertaken is consistent with our law on subrogation. Our courts have found that "[subrogation is] highly favored in the law." City of Asbury Park v. Star Ins. Co., 242 N.J. 596, 605 (2020) (alteration in original) (quoting Wienberg v. Dinger, 106 N.J. 469, 489-90 (1987)). "It has long been appreciated that [s]ubrogation is a device of equity to compel the ultimate discharge of an obligation by the one who in good conscience ought to pay it [and] . . . to serve the interests of essential justice between the parties." Id. at 604 (alterations in original) (quoting Culver v. Ins. Co. of N. Am., 115 N.J. 451, 455-56 (1989)) (internal quotation marks omitted). Under that standard, holding Laura responsible for repaying plaintiff the $195,431.91 it had provided to resolve the foreclosure action was fair and equitable.

11

Thus, based on our de novo review, we affirm the January 17, 2025 order granting plaintiff's cross-motion for summary judgment on plaintiff's unjust-enrichment claim and denying defendant's summary-judgment motion. Because the court correctly decided the summary-judgment motion and cross-motion, we affirm the February 14, 2025 order denying defendant's motion for reconsideration. Having affirmed summary judgment in plaintiff's favor on the unjust-enrichment claim, we need not and do not address the parties' arguments regarding plaintiff's fraud and negligent-misrepresentation claims.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M. C. Hanley

Clerk of the Appellate Division

A-2941-24